Judge Umderwood
delivered the opinion of the court.
Ik 1792, Osborn Sprigg, the ancestor of the appellants, executed an obligation, conditioned to convey Sprigg’s interest in a preemption of one thousand acres, on Murray’s run, a branch of Cox’s creek, and also the half of four hundred acres, granted in the name of Joseph Vinson to Richard Chenowetb, so soon as he paid £180, agreeably to two bonds of the same date. These bonds were for the payment of £90 each, the one due on the 1st of November, 1793, and th.e other on the 1st of November, 1794.
In 1793, Chenoweth executed an obligation conditioned to convey to William Albin, the ancestor of the appellees, five hundred acres of land on Murray’s run, a branch of Cox’s creek, by deed, with general warranty, within seven days from the date of the contract. It is not declared, in this obligation, that the land to be conveyed was the same which Sprigg, by the contract of 1792, was to convey to Chenowetb. That such was the case, is oniy to be inferred from the identity of description, and the fact that,-in March or April, 1794, J. Cox laid off five hundred acres out of the aforesaid preemption for Albin, which, in the course of that year, or the next at farthest, be settled, claiming to hold the same under the obligation from Chenoweth. Sprigg was a citizen of Virginia, Che-noweth of Kentucky. The conclusion is almost irresistible, that Chenoweth could not have stipulated' with Albin in good faith, to make him a deed-of conveyance within seven days from the date of their contract, if the five hundred acres sold him, were to be made up of Sprigg’s interest in the one thousand acres tract; because, when he made that stipulation, he had no conveyance from Sprigg, and had paid no part of the purchase money; and there is nota particle of evidence conducing, in the slightest degree, to show, that' lie had, at the date of his contract, any expectation of being able to procure the title in time to, comply with it.
*159 In 1816, tbe appellees filed their hill against the appellants, as the unknown heirs of Sprigg, and the heirs of Cbenoweth, (who liad previously died,) praying for a specific execution of the contract, and offering to pay whatever of the purchase money had not been paid. It appears, by subsequent amendments, that the land claimed by the original bill, was not the land called for, or embraced by, the covenant of Sprigg, or that of Chenoweth. The offer to pay the reman ing purchase money was withdrawn, and it was insisted that the whole had been paid, and that deeds of conveyance had been made. .The amendment, making these allegations, was filed in 1825. and it is very manifest, that the charges relative to the payment of the purchase money, and the execution of deeds of conveyance, an; made, based upon the presumption arising from the length of possession by the appellees, and their ancestor.
It seems, that in August, 1795, Chenoweth paid £40 Is. 3d. to L. Haff, which he credited on the bond of Chenoweth, which became due in Nov. 1793, Haff having been employed by Sprigg to collect both bonds. Chenoweth obtained this money from D. Omer, to whom he sold the Vinson tract. Omer being unable to procure a title, sued Chenoweth, and his surety M. Mayfield, on their title-bond, and recovered. May-field paid part of the judgment, and thereafter instituted a suit in chancery, to-obtain from Haff the said £40, in whose hands it was likely to remain, because Sprigg refused to take it, unless the whole purchase money was paid, and Chenoweth refused to receive it back and cancel the contract. At least, such is Haff’s answer to tbe bill ofMayfield, who made Sprigg and the heirs of Chenoweth defendants, as well as Haff. This suit was compromised, by Haff paying to Mayfield the money, and taking a bond, with surety to indemnify Haff against Sprigg’s or Chenoweth’s claim to the money.
The boundary of the land laid off by Cox forAlbtiu is notlaid down on the connected plat, in such a manner as to exhibit the position of the various settlements made thereon. It ho wever appears, from the proof and exbihits in the cause, that an elder grant in the name of William Mitchell, covers much the larger *160 part of Sprigg’s preemption of one thousand acres, and" <a^es 'bree hundred and two acres of the land laid by Cox for Albin, (the boundary of which contains five hundred and forty, instead of five hundred acres,) upon which three hundred and two acres, the settlement made by Albin is situated. In 1815, Davis, as lessor of the.plaintiff claiming under Mitchell’s patent, succeeded in obtaining a judgment, in an action of ejectment against Edward Evans and Linnev Albin, the. widow of William Albin, Chenoweth’s vendee. The declaration and riotice were served on Evans and Mrs. Albin, in May. 1813, and during that year all the' Albins moved from the land, and Evans states, that Mrs. Albin would not have defended the suit, but at his instance, with a view to obtain compensation for improvements. It may be inferred from the testimony, that the tenants of some of the Albin family held possession, after the removal in 1813, up to the judgment of eviction in 1815; but the evidence on this subject is very indefinite, nor is it a matter of much consequence to the correct decision of the controversy.
William Norton entered upon the land in 1812, claiming adversely to Sprigg’s preemption patent. In 1816, an action of ejectment was instituted against him by Sprigg’s heirs, in which the latter obtained judgment of eviction in 1820, since which time Norton has held under them, having made a contract for the land at $12 per acre. It also appears, that Sprigg’s heirs acquired possession of pari of the land, by their vendee, Watkins, as early as 1816, through Malo'n.
It is abundantly established by the evidence, that the appellees knew that Chenoweth claimed under Sprigg’s title; and it is equally clear, that none of them ever pretended to hold the land under an executed contract. Ii is not shown, what was the consideration which Albin was to.'give, or that it was ever-paid, although some of the witnesses express theit belief that it was. It is clear, that the appellees were long apprised of tho difficulty of procuring a title, and that some of them assented to a sale of part of the land by Chenoweth, to enable him to rai«e money to secure the title. One of them invited Mrs. Graham, as early as 1805 or 6, to settle on the land as Spriggjs. *161 and she did so without acknowledging tenancy under ilie Albins.
Contract to convey land “so soon as purchase money is paid,” payment is a condition pendent.
James C. Sprigg, one of the appellants, answered, conceding nothing favorable to the claim set up by the appellees. The court rendered a decree in favor of the ■appellees, to reverse which this appeal is prosecuted;,
We shall consider the case upon its merits, without attending to the question's of minor importance 'presented by the assignment of errors. The record very satisfactorily* establishes the facts we have stated, and the only question growing out of them, is, can the ap-pellees rightfully claim a conveyance*for any part of the land, from the heirs of Sprigg?
As the heirs of Albin claim under Chenoweth, and he claims by contract with the ancestor of the appellants, their condition is no better than Chenovveth’s would be, unless they can abandon the written contracts which have been exhibited and proved, and rely upon an'independent title resulting from length of possession. This it seems they have attempted to do; but before investigating that branch of the cause, we deem it proper to consider it, as though it were to be decided without reference to the possession of the appellees.
It is clear, from the contract between' Sprigg and ■Chenoweth, that the payment of the two bonds, for JC90 each, was a precedent condition, to be performed by the latter before he was entitled to a conveyance of the land. These bonds have not been satisfied, and therefore, upon the contract alone Chenoweth is not entitled to the land. Even the "£40 which were ' paid to-Half, passed from him to Mayfield, the creditor of Chenoweth, so that he derived the benefit of the ■ money placed in Hafir’s hands, and not Sprigg.
More than twenty years had elapsed from the time both bonds were due, before the institution of this suit, during which period Chenoweth and his representa*, lives had neglected to perform the condition upon which his right to the land depended. The bill ■ states, that he died insolvent; consequently, Sprigg was left without the means of enforcing the collection of his debts. The precisé time of his death has not been shown. Mayfield’s suit against his heirs, *162 it ns commenced .in 1805, and the testimony justifies the inference that he died before that period.
Ncsleot., for more than 20 years, to per-forin a condition upon which the right to a conveyance of land depends, unless excused by ignorance, fraud, or legal inability, will prevent theinter-posilion of chancellor.
If condition had been per-ibrmed, ven-dee in possession might have specific performance, no matter what loss of time.
Presumption of tille, resulting from 420 years possession, not absolute but •prima facie.
A delay of-more than'twenty years to perform a condition, upon which a right to lands depends, when thpre is no ignorance, fraud, or inability, relied on as an excuse for non-performance, other than acknowledged insolvency, is,in our opinion, such trifling with the contract, as should induce the chancellor to refuse a specific execution of it in favor of the obligee, or his vendee or assignee. No tender of the money, of offer to pay, after the lapse of twenty years,should cleanse the taint resulting from the delay, especially when the property has appreciated in value, as in this case, many hundred per cent. There would be manifest injustice in withholding money from a vendor, which might‘be reinvested in other lands, affording reasonable prospects of a rapid appreciation in value for twenty years, and'then compelling him to accept it, and part with -land worth more than ten times the amount. . Such rewards the chancellor cannot decree to negligence. The case of Frazier vs. Broadnax, II Litt. 249, is an authority-in support of the foregoing doctrines, and there is between (hatease and this several points of analogy. If the appellees or their ancestor, or Cbenownlh, under whom they claim, had paid the purchase money, tiren, as by -such payment, their equity would have been complete; no length of .time would have prevented their success in claiming a specific execution pf the contract, they remaining ’and continuing in possession of the land.
The decree cannot be sustained upon the ground ■ of a specific execution of the contract.
Wo do not perceive in the evidence, any thing favorable to the appellees, to corroborate the inference which they contend should be drawn from tire length of possession; -and therefore, their claim to title must rest alone upon the fact of possession.
It is conceded, that twenty years continued possession of land being shown, creates a legal presumption •that the occupant has title. But this presumption is not of that absolute and conclusive character, which will admit of no explanation. The law, from motives of sound policy, does, in some instances, create and sustain artificial presumptions» which admit of no con- *163 iradiction or explanation. Thus the rule, that p'os-session of goods remaining with the vendor, after an absolute conveyance, is per se fraudulent in respect creditors, cannot be avoided or contradicted by any. proof as to honesty of intention on the part of the vendor. But we know of no artificial presumption, which establishes a positive rule, requiring courts and juries to regard the occupant of lands as possessed of an absolute title, merely because he, and those under whom he claims, have continued in possession for twenty years. On the contrary, it is well settled by authority, that the nature of the possession, whether it be adverse or friendly, may be shown by proof; and if friendly, then the presumption of title, resulting from the mere fact of continued possession, is destroyed.
When entry upon land is tory^oTtraot, the possession i3 friendly, tenant^no^ ¡apse of time, will bar the lancl’l°rc1-
Presumption b[,tte ™bv eir-oumstanccs..
No length of possession will invest a tenant, or quasi tenant, with the title of his landlord. Starkie says, “notwithstanding a continuance of possession far exceeding twenty years, if the original possession can be accounted for consistently with a title existing in another, it will be competent to the latter to rebut the presumption arising, from the continuance of the possession III Vol. 1217. Now, if it be conceded that the appellees and their ancestor together, have.had twenty years possession complete;yet the facts prove beyond doubt, that the original entry was made under an executory contract, that the appellees looked to Chenoweth for a title, and that he looked to Sprigg, and that they held as quasi tenants under the title of Sprigg. Here then is a friendly possession, commenced and continued -“consistently with the title” of Sprigg. Consequently-the presumption arising from twenty years possession is rebutted, .and, as that possession was not adverse, it does not confer title of itself, or toll the appellant’s right of entry; and even if it did, in a case situated like this, we should be disposed to leave the parlies to settle their rights before a common law tribunal.
We are of opinion that the possession of the appel-lees, and those under whom they claim, will not sustain the decree.
The presumption of payment insisted on, to show that the two bonds for £90 each have been discharged, ' cannot he indulged. That presumption is amply re *164 butted by the death of Chenoweth, his admitted, as well as previous, insolvency, and a variety of circumstances, all tending to show that Sprigg never received any part of the money.
inconsistent with court pleading and practice, to-found a decree upon a state of. case not alleged'in the bill of complainant.
Monroe and Crittenden, for appellants; Hardin, for appellee.
It has been insisted, that Chenoweth was the original proprietor of the entire one thousand acres preemption, patented in the name of Sprigg; and that the latter only became entitled to half, in consideration of clearing out of the office forChenoweth his settlement and pre-emplion rights; and therefore, independent of .Sprigg’s obligation of 1792, to convey to Chenoweth his interest, that Albin’s heirs, standing in the attitude of Chenoweth’s vendee,have a right to demand a partition with Sprigg’s heirs, and thus to secure Cheno-weth’s original interest in the tract, if n.o more. The circuit court seems to have been somewhat influenced by this view of the case. We consider it untenable. It is not embraced by the bill, Or any supplement; and to indulge it without allegation, would be to tolerate a total departure from every avowed object- of the pleadings. A specific execution of Sprigg’s contract, or the confirmation of a title founded in presumption, are the objects of the bill. The idea of a, partition of joint rights, is no where held forth. - When that subject is brought into litigation, it may be that it will be shown that partition has already been made.
In relation to this-point, we think the parties were-not bound, under the pleadings, to make any preparation, and might justly complain of surprise by making, it the grounds fqr a decree. But as the bond of Che-noweth to Albin, might as well have embraced Cheno-weth’s interest in the preemption, which he was entitled to, independent of his contract with Sprigg, as it did the land claimed under that contract, we shall not now say what effect the possession of Albin and his heirs might have had upon the controversy, if the bill had been filed with a view to reach this interest of Chenoweth, and for a partition with Sprigg.
The decree of the circuit court-is reversed with costs, and the cause remanded, with directions to dis'-t miss the bill.